# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Jul 01, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

In the Matter of the Search of

The person of Trevon L. McDaniel; the residence located at 9835 Emerald Park Dr, Elk Grove, CA, 95624; and a white 2009 Jeep with CA license plate 6KGN305

Case No. 2:26-sw-0584 JDP

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1 – A-3, attached hereto and incorporated by reference.**

located in the Eastern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371 | - Conspiracy; |
| 18 U.S.C. § 844(f)(1) | - Attempt to damage or destroy property owned or possessed by the United States; |
| 18 U.S.C. § 844(i) | - Attempt to damage or destroy any building by means of fire or explosives; |
| 18 U.S.C. § 1366 | - Attempted destruction of an energy facility; and |
| 26 U.S.C. § 5861(d) | - Receipt or possession of an unregistered explosive device |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice ______ days (give exact ending date if more than 30 days: ____________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Kyle Roberts
*Applicant's signature*

Kyle Roberts, FBI Task Force Officer
*Printed name and title*

Sworn to me and signed telephonically.

Date: July 1, 2026

*Judge's signature*

City and state: Sacramento, California

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Kyle Roberts, having been duly sworn, state as follows:

## I. AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following person, Trevon McDaniel ("MCDANIEL" or "Target Subject") further described in Attachment A-1, as well as MCDANIEL's residence, a one-story single-family residence with an attached three-car garage, located at 9835 Emerald Park Dr, Elk Grove, California, within the Eastern District of California (hereinafter "Target Premises") as further described in Attachment A-2, and MCDANIELS' vehicle (hereinafter "Target Vehicle") described in attachment A-3, for things described in attachment B.

2. I am a Detective/Task Force Officer with the Sacramento Police Department and have been since May 13, 2024. I am currently assigned to the FBI Joint Terrorism Task Force. As a deputized federal agent, I am authorized to investigate violations of laws of the United States issued under the authority of the United States. My investigative responsibilities include ideological violent crime.

3. In July of 2014, I attended the Sacramento Police Academy and graduated in December of 2014. This academy was certified by the California Commission on Peace Officer Standards and Training (POST). During this approximately six (6) month long academy, I received basic instruction in all aspects of policing which included but was not limited to: investigation, interviewing, criminal law, arrest procedures, firearms, arrest control, and police tactics.

4. Since December of 2014 to present, I have conducted, as well as participated in, no less than one hundred (100) preliminary criminal investigations, including but not limited to: homicide, rape, robbery, burglary, assault, fraud, larceny, traffic offenses, and various narcotic related offenses. During these investigations, I conducted interviews with victims, witnesses, and suspects and have made numerous arrests as a result.

5. In January of 2020, I attended an eighty (80) hour class titled, "ICI Basic Investigations", which was taught by ICI. During the class, I was taught how to conduct standard investigations from start to finish. I was also taught basic search warrant technique, interview and interrogation, an introduction to the California Electronic Communication Privacy Act (ECPA) in relation to search warrants, as well as crime scene investigation.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Where statements made by other individuals are referenced in this Affidavit, such statements are described in sum and substance and in relevant parts only. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant in a parts only.

8. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe evidence, instrumentalities, contraband, and/or fruits, as further described in Attachment B, of violations of 18 U.S.C. § 371 – conspiracy; 18 U.S.C. § 844(f)(1) – attempt to damage or destroy property owned or possessed by the United States; 18 U.S.C. § 844(i) – attempt to damage or destroy any building by means of fire or explosives; and 18 U.S.C. § 1366 – attempted destruction of an energy facility, and 26 U.S.C. § 5861(d) – receipt or possession of an unregistered explosive device (collectively, the "TARGET OFFENSES") will likely be found in the locations to be searched, described in Attachments A-1 through A-3.

## II. PURPOSE OF AFFIDAVIT

9. The FBI is investigating a plot to carry out attacks against federal property and officials, including an attack at an Ultimate Fighting Championship ("UFC") event that took place on Sunday, June 14, 2026 ("UFC Freedom 250") on the South Lawn of the White House in Washington, DC, as well as additional attacks centered around the July Fourth holiday. While MCDANIEL, the TARGET SUBJECT, was not a participant in the conspirators' Signal chat

group, he was in direct communication with one of the principal co-conspirators, Abraham Hermosillo Alvarez ("ALVAREZ"). MCDANIEL discussed plans with ALVAREZ and posted at least one video to TikTok about conducting an attack centered around the July Fourth holiday involving the use of fireworks against police, ICE, and federal buildings.

10. During the course of this investigation, the FBI identified a group of conspirators, who planned to procure weapons and carry out coordinated attacks on June 14, 2026, including at the UFC Freedom 250 event. Several other members of the conspiracy have been arrested and charged, including the following:

a) On June 12, 2026, Tycen C. Proper ("PROPER") was charged in a federal criminal complaint in the Southern District of Ohio for his involvement in this plot.

b) On June 14, 2026, ALVAREZ was charged in a federal criminal complaint in the District of Nebraska for his involvement in this plot.

c) On June 14, 2026, Michael Alan Thomas ("THOMAS") was charged in a federal criminal complaint in the Central District of California for his involvement in this plot.

d) On June 14, 2026, Byan Omar Roa ("ROA") was charged in a federal criminal complaint in the Central District of California for his involvement in this plot.

e) On June 15, 2026, Daniel K. Eskridge ("ESKRIDGE") was charged in a federal criminal complaint in the Western District of Missouri for his involvement in this plot.

f) On June 19, 2026, William Lee Spartacus Falkner ("FALKNER") was charged in a federal criminal complaint in the Western District of Washington for his involvement in this plot.

g) On June 21, 2026, Jordan W. Rincker ("RINCKER") was charged in a federal criminal complaint in the Western District of Missouri for his involvement in this plot.

## III. SUMMARY OF PROBABLE CAUSE

### A. Ohio Law Enforcement Uncover a Plot to Assassinate Federal Officials at the UFC Fight

11. Based on my conversations with other law enforcement officers, review of relevant reports, databases, videos, photos, and extracted digital evidence pursuant to search warrants, I understand the following:

12. On or about June 10, 2026, at approximately 9:18 p.m., officers with the Knox County, Ohio Sheriff's Office and Danville, Ohio Police Department were dispatched to an address in Danville, Ohio in reference to a disturbance. The caller, identified as the mother of Tycen J. PROPER,[1] was concerned about her son, Tycen J. PROPER ("PROPER"), due to his recent conduct, including purchasing firearms and communicating with concerning individuals online.

13. Subsequent investigation revealed that PROPER had several boxes of ammunition (estimated by law enforcement to be in the thousands of rounds of ammunition), two plate carriers with AR-style magazines, an AR-style rifle, and a bullpup rifle painted with an American flag. PROPER also had a large quantity of boxes of spent ammunition, rounds of spent cartridge casings, and other tactical clothing. PROPER also had a journal in his room that included pages in which PROPER wrote that the government wants to control people and that a larger group worships a demonic figure and sacrifices children to it. The journal also had a list of approximately 46 names, which included celebrities and politicians.

14. Law enforcement also searched PROPER's Apple iPhone. During a preliminary review of the device, investigators observed his chats on Signal groups that laid out detailed plans to conduct an attack in Washington D.C. with several unidentified coconspirators. In those chats, law enforcement saw detailed imagery of the National Capitol Region and maps of the area with different potential sniper locations highlighted, potential drone launch locations identified, and other detailed tactical planning.

---

[1] I know the name of PROPER's mother, but in this affidavit, I refer to her as the mother of PROPER.

15. Then, during a consensual interview, PROPER admitted to planning with others a coordinated attack against the United States government, to take place during the UFC Freedom 250 event scheduled to take place on the South Lawn of the White House in Washington, D.C., on Sunday, June 14, 2026. PROPER also provided additional details on the planned attack and stated that the plan as he knew it was to stage a demonstration on the north side of the White House. While the demonstration was taking place, the group would fly small, unmanned aircraft (*i.e.*, drones) laden with unspecified explosive devices which would detonate over the north side of the UFC arena. When the unmanned aircraft detonated, the intent was to force the crowd attending the UFC event and high value targets ("HVTs") to evacuate toward the south side of the White House. PROPER stated that the plan was that members of his group would act as snipers and additional shooters, preferably with long guns, staged at the south to conduct shootings of the members of the crowd and HVTs as they fled from the explosive devices which had just been detonated.

16. PROPER told law enforcement that his cellphone contained other Signal chats and that the participants of this group were primarily recruited through TikTok. Once an individual had proven himself to be an established member of the group on TikTok, they were then transitioned to a vetted (and more secure) Signal chat. PROPER stated that the group exchanged videos, pictures of tactical kits, physical training proof, and other material through TikTok direct messages.

17. PROPER also informed investigators that he had been planning to drive to Washington, D.C., from Ohio, travelling through West Virginia. In West Virginia, he planned to meet up with another co-conspirator of the online group and then to drive with that individual the rest of the way to Washington, D.C. PROPER also indicated that he had purchased equipment for the attack for other individuals.

**B. Information Obtained from ALVAREZ's Post-Arrest Interview and Phone Corroborates the Existence of a Conspiracy to Attack the UFC Freedom 250 Event at the White House.**

18. Law enforcement identified ALVAREZ as a co-conspirator. On June 14, 2026, the FBI conducted a search warrant on ALVAREZ's residence in Nebraska. ALVAREZ was detained and interviewed at the time of the search. As part of the search, the data from ALVAREZ's cellular telephone was downloaded and reviewed by investigators.

19. The search of ALVAREZ's cell phone revealed chats in the Signal app, in a group titled "Lions den." A user going by the online moniker "Shepherd" appeared to be posting a large portion of the messages relating to the UFC Freedom 250 attack planning. Based on my review of the seized device in support of Alvarez's complaint and my knowledge of this investigation, I believe ALVAREZ utilized the username "Shepherd." On June 14, 2026, in this chat group, ALVAREZ provided direction to other co-conspirators regarding the planned attack on the UFC 250 event. ALVAREZ admitted in his post-arrest interview that he used the online moniker "Shepherd."

20. On or about June 10, 2026 at approximately 12:04 AM UTC, ALVAREZ messaged in the "Lions den" chat that a briefing would start momentarily. ALVAREZ stated later that he and others in the group "will have a tier system, this system will split us into groups depending on boots on the ground vs farmers and growers." Another member in the group, "Whiskey_Six(CA)", asked, "Anyone willing to commit the most heinous of crimes raise their hands." ALVAREZ later stated, "There's 22 operators here. Each will lead a team. To do what (only we will know) each team will not know the specifics of one another, only the date." ALVAREZ later stated, "Each of us is a match. Each can start a fire," and the said, "So here's the plan." ALVAREZ then shared a statement that read,

a) "DC is the main event. But: not everyone will be able to make it, those that do will need an evacuation route and plan. Head south follow the river, we are working on air support (not guaranteed) the objective is for ground units to support operations

long enough for the signal. You will when you see it. When that happens. All hell will break loose. At the same time: I have word the multiple teams are making moves on data centers, and ice camps. Breach, rescue, destroy, sabotage, stall. This op will require many teams and leaders. I will coordinate this through. Stand by for further directives."

**C. ALVAREZ and other co-conspirators discuss separate California attack plans**

21. On June 11, 2026, ALVAREZ added members to a Signal group chat named "Sauron Eye." In this chat, ALVAREZ shared a plan in which the "Sauron Eye" group would target COMPANY 1, a prominent software company with offices in California and specializing in data analytics, and "Hyperscale Data Centers" because they would have a "devastating effect, not just on [COMPANY 1] but on the state's entire digital ecosystem." ALVAREZ went on to write, "The goal is not indiscriminate destruction but to capture data and take control of the infrastructure. Striking its command and control center would cripple its ability to coordinate." ALVAREZ then proceeded to share two addresses belonging to COMPANY 1 as the actual targets for the group to target.

22. On June 12th, ALVAREZ stated that "we have until the 4th. The 14th will give them the cause they need to bust out their robotic toys. We need to disable [COMPANY 1's] arms." I believe that this is significant because ALVAREZ mentioned the 14th, which was the planned day for the attack at the UFC Freedom 250 event, and ALVAREZ believed that the event on the 14th would make it essential for the alleged planned attack at COMPANY 1's facilities. ALVAREZ later stated that "it will give our forces the ability to overcome them." ALVAREZ then wrote that "without their tech they are nothing." ALVAREZ later wrote that that their "mission to to blind the eye and disable their tech" and that it would give "our forces time to make a move."

**D. Direct Messages Between ALVAREZ and MCDANIEL Found on ALVAREZ's Phone**

23. ALVAREZ's phone contained direct messages on the TiKTok messaging application between ALVAREZ and the TikTok account "the_wild_wolfspider" from, on or about

April 17, 2026 to June 7, 2026. The user of "the_wild_wolfspider" TikTok was subsequently identified as MCDANIEL, as explained below.

24. Within the messaging thread between ALVAREZ and MCDANIEL, I observed that both ALVAREZ and MCDANIEL shared videos between some of the text content. Due to the limitation of the downloaded data, the videos appeared to be unavailable to view. Due to the missing video content, some of the messages were missing the full context.

25. On April 18, 2026, ALVAREZ messaged MCDANIEL the following:

- ALVAREZ: "Once the clock hits it will be total surveillance."
- ALVAREZ: "We need to gather as many hero's before the 22."
- ALVAREZ: "I'm sure you know this bird is cooked. Time to set sail."
- ALVAREZ: "Good we need all the help we can get get. Tis the age of hero's."

26. Between May 4, 2026 and May 5, 2026, ALVAREZ and MCDANIEL had the following conversation:

- ALVAREZ: "July is the month."
- MCDANIEL: "Fourth of July"
- MCDANIEL: "Use subliminal messaging so people understand what you mean, but basically fireworks it's a good distraction and good use for ice and cops."
- MCDANIEL: "If you understand what I mean, give me a thumbs up."
- MCDANIEL: "Copy that captain."

I believe these conversations to be significant because, although MCDANIEL was not a member of the conspirators' Signal chat group, the rhetoric and content of these communications are similar in nature to some of the plans discussed on the Signal chat group, specifically including discussions using fireworks or explosives as a distraction for law enforcement.

**E. Threat made on TikTok by the "the_wild_wolfspider" account**

27. On June 25, 2026, I conducted open source research on TikTok for account, "the_wild_wolfspider" (UID:7408882637893239854), and located a video that was posted on June 23, 2026, where the account displayed an individual (MCDANIEL) wearing black Spider-

Man like mask with red eyes, a dark multi-toned vest with a fluffy light brown hood-trim and x-men style patch on the right breast, a black long sleeve shirt with a red spider on the chest, and camouflage patterned pants.




28. In this video, MCDANIEL made statements about conducting an attack against federal buildings in Sacramento. MCDANIEL stated that he was "just plotting, planning, and scheming." MCDANIEL mentioned that "the 4th of July is coming," "Make sure to hold onto your fireworks," and "We might need to make some noise this year." MCDANIEL then ends the video by saying, "I'm not really plotting or planning or telling anybody to do anything… I'm just saying, for everyone in Sacramento, we know you love your fireworks. It'd be a shame if fireworks were going off near generators, so certain federal buildings were losing their power… Hmm… Tick Tock Sacramento, Tick Tock."

**F. Identification of MCDANIEL as the TikTok user "the_wild_wolfspider" and his connection to the TARGET PREMISES and TARGET VEHICLE**

29. Customs records revealed that MCDANIEL is connected with multiple imported items connected with superhero/supervillain costumes and/or imported under the name "Wolf Spider" or "Spider Wolf."

30. On June 29, 2026, HSI Special Agent (SA) Francisco Fajardo conducted import queries via Department of Homeland Security (DHS) law enforcement database queries. SA Fajardo utilized the data points "Wolf Spider" and "Spider Wolf" when he conducted the import history query. The import query identified 15 import records for the address: 1839 Sandpiper Lane, Apt. 160, McKinleyville, CA 95519 (1839 Sandpiper Lane).

- SA Fajardo identified an import shipment that arrived at the U.S. on January 5, 2025, that was destined for Trevon McDaniel at the 1839 Sandpiper Lane address. The shipment was manifested as "TOY MASK PLASTIC." SA Fajardo identified another shipment that arrived at the U.S. on December 24, 2024, that was destined for WOLF SPIDER at the same 1839 Sandpiper Lane address. The shipment was manifested as "PAPER ALBUM FOR COLLECTIONS."
- SA Fajardo conducted an import query using the "TREVON MCDANIEL" data point. The import query identified 27 import records for TREVON MCDANIEL. The query revealed 13 import records for the 1839 Sandpiper Lane address and 14 import records for the TARGET PREMISES. The imports that went to the TARGET PREMISES contained shipments such as cloth patches, accessories, men's and women's cartoon masks, and mask fabric.
- SA Fajardo conducted an import query for the TARGET PREMISES and identified 51 import records. One import record was identified as arriving into the U.S on March 31, 2025, that was destined to be sent to "TRE MCDANIEL" at the TARGET PREMISES. The shipment was manifested as "HALLOWEEN USE ELASTANESPANDEX SPIDE."

31. Additional record searches confirm MCDANIEL's connection with the TARGET ADDRESS:

- On June 29, 2026, I conducted an NCIC query for the name Trevon MCDANIEL in California. The query returned a single result for Trevon MCDANIEL (CA ID: Y7956800) with a date of birth of January 24, 2001, and a residence address at the TARGET PREMISES.
- On June 30, 2026, I submitted a subpoena and emergency data request to TikTok. TikTok provided a subscriber email of trevonmcdaniel24@gmail.com and IP address history dated June 30, 2026. On June 30, 2026, an Emergency Data Request (EDR) was submitted to Comcast for the IP addresses previously provided by TikTok. Per the response from Comcast, the subscriber for the IP address utilized by TikTok account "the_wild_wolfspider" was shown as Lynn McDaniel[2] at the TARGET PREMISES.
- On June 30, 2026, I conducted an Accurint query for Trevon MCDANIEL. Per the Accurint query, MCDANIEL showed to have a residential address of the TARGET PREMISES, and an email address of trevonmcdaniel24@gmail.com.

32. On July 1, 2026, law enforcement conducted a ruse at the TARGET PREMISES. MCDANIEL answered the door. MCDANIEL also confirmed he had previously lived at the 1839 Sandpiper Lane address, but had moved to the TARGET PREMISES about three years ago.

33. On June 30, 2026, an NCIC query of MCDANIEL showed the TARGET VEHICLE, a white 2009 Jeep with CA license plate 6KGN305 registered to Trevon Louvell MCDANIEL, at the TARGET PREMISES. An LPR query of the target vehicle showed a scan on April 3, 2026, where it was parked directly in front of the TARGET PREMISES. Law enforcement also observed MCDANIEL accessing the TARGET VEHICLE during the July 1, 2026 ruse.

---

[2] Likely MCDANIEL's mother or grandmother.

## IV. TECHNICAL TERMS

34. Based on my training and experience, I use the following technical terms to convey the following meanings:

a) IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by devices on the Internet. Every device attached to the Internet must be assigned a public IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. An IP address acts much like a home or business street address—it enables devices connected to the Internet to properly route traffic to each other. Devices connected to the Internet are assigned public IP addresses by Internet service providers ("ISPs"). There are two types of IP address: IPv4 (Internet Protocol version 4) and IPv6 (Internet Protocol version 6). An IPv4 address has four sets ("octets") of numbers, each ranging from 0 to 255, separated by periods (e.g., 149.101.82.209). An IPv6 address has eight groups ("segments") of hexadecimal numbers, each ranging from 0 to FFFF, separated by colons (e.g., 2607:f330:5fa1:1020:0000:0000:0000:ood1).

b) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c) Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## V. COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35. As described above and in Attachment B, this application seeks permission to search for records that might be found at TARGET PREMISES, in whatever form they are found.

One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36. *Probable cause.* I submit that if a computer or storage medium is found at TARGET PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is

typically required for that task. However, it is technically possible to delete this information.

d) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37. *Forensic evidence.* This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the locations to be searched because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the

owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VI. BIOMETRICS

40. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a) I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b) If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c) If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d) In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e) As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f) I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted,

inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g) In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h) Due to the foregoing, if any devices may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe MCDANIEL's fingers (including thumbs) to the fingerprint scanner of the device; (2) hold the device in front of MCDANIEL's face and activate the facial recognition feature, for the purpose of

attempting to unlock the device in order to search its contents as authorized by this warrant.

## VII. AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT – DIGITAL DEVICES ONLY

41. Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown and therefore request authority to conduct the search of digital devices at any time of the day or night.

## VIII. CONCLUSION

42. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, will be found on the Target Subject, Target Residence, and Target Vehicle as described in Attachments A-1 through A-3.

## IX. REQUEST FOR SEALING

43. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Kyle Roberts
Kyle Roberts
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to telephonically before me on July 1, 2026

HONORABLE JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

*/s/ Elliot C. Wong*
Approved as to form by AUSA ELLIOT WONG

**ATTACHMENT A-1**

PERSON TO BE SEARCHED

The person of Trevon L. McDaniel, whose date of birth is January 24, 2001, and according to his California Driver's License is approximately 5'10" and 230 lbs. The search of MCDANIEL shall include any and all clothing and personal belongings, electronic/digital devices, backpacks, wallets, briefcases, purses, and bags that are within MCDANIEL's control. A photo of MCDANIEL is included below.



**ATTACHMENT A-2**

PREMISE TO BE SEARCHED

The premises to be searched is the residence located at 9835 Emerald Park Dr, Elk Grove, CA, 95624, within the Eastern District of California (the "Target Premises"). The residence consists of an approximate 1,782 square-foot single story, single-family residence. It has light siding with white trim. The residence has a three-car garage that faces west towards Emerald Park Dr. The house numbers '9835' are prominently displayed with black numbering and affixed to the right side of the three-car garage.

The scope of the search shall extend to all areas of the property, including outbuildings and vehicles on the property, over which MCDANIEL has shared or exclusive access or control. A photo of the target premises is included below.



# **ATTACHMENT A-3**

VEHICLE TO BE SEARCHED

The vehicle to be searched is a white 2009 Jeep with CA license plate 6KGN305, registered to Trevon Louvell MCDANIEL at 9835 Emerald Park Dr, Elk Grove, CA. A photo of the target vehicle is shown below:



# ATTACHMENT B

## Particular Things to be Seized

1. The items to be seized are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371 – conspiracy; 18 U.S.C. § 844(f)(1) – attempt to damage or destroy property owned or possessed by the United States; 18 U.S.C. § 844(i) – attempt to damage or destroy any building by means of fire or explosives; and 18 U.S.C. § 1366 – attempted destruction of an energy facility, and 26 U.S.C. § 5861(d) – receipt or possession of an unregistered explosive device (collectively, the "TARGET OFFENSES") suspected to have occurred in or around June and July 2026, involving MCDANIEL and others known and unknown:

a. Records, information, documents, programs, applications, photographs, video recordings, audio recordings, communications, items, materials, and other indicia pertaining to acts of violence, including mass casualty threats, firearms and other dangerous weapons, explosives, and destructive devices;

b. Records, information, documents, programs, applications, photographs, video recordings, audio recordings, communications, items, materials, and other indicia pertaining to firearms and other dangerous weapons, explosives, and destructive devices, and components, equipment, and supplies to construct explosives and destructive devices, and destructive devices;

c. Records and information related to murder or shooting politicians, celebrities, wealthy individuals, or other high-profile individuals;

d. Records and information related to acquiring or building weapons, including firearms, ammunition, and explosives, to murder and shoot politicians, celebrities, wealthy individuals, or other high-profile individuals;

e. Records and information related to travel to the area of Washington D.C.;

f. Records and information related to obtaining money or paying for expenses to plan for or commit the TARGET OFFENSES;

g. Records and information related to motivations to commit the TARGET OFFENSES, including perceived objections with the United States government or political officials;

h. Assembled improvised incendiary and/or explosive devices and unassembled components and parts of these devices;

i. Costume clothing, including, but not limited to a black Spider-Man-like mask with red eyes; a dark multi-toned vest with a fluffy light brown hood-trim and x-men

style patch on the right breast; a black long sleeve shirt with a red spider on the chest; and camouflage patterned pants.

j. Drones and drone components, specifically any parts that would allow a drone to hold or release explosive devices;

k. Firearms, firearm accessories and components, and associated ammunition that was to be utilized in the planned attack;

l. Tactical gear, including but not limited to tactical vests, body armor, helmets, and backpacks.

m. Literature and electronic data, media and hardware related to the construction or function of incendiary or explosive devices, including books, pamphlets, drawings, sketches, diagrams, photographs, photocopies, video or audio recordings, and electronic generated or stored data, media and hardware.

n. Records and information relating to a conspiracy to engage in the violations described above;

o. Indicia of residency, including but not limited to utility bills, mortgage statements, subscriber information and mail.

p. Records or keys showing possession of safe deposit boxes, safes, storage units, and any other type of storage areas, including passwords and/or access codes for access during the searches.

q. Records or other items that indicate ownership or use of digital devices or related equipment found in the above premises, including sales receipts, bills, and handwritten notes;

r. Any locked or closed containers believed to contain any of the above-mentioned evidence.

s. Cellular telephones.

2. Computers or storage media used as a means to commit the TARGET OFFENSES, including communicating with co-conspirators or planning to commit the TARGET OFFENSES.

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry

entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user’s state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER’s Internet activity, including firewall logs, caches, browser history and cookies, “bookmarked” or “favorite” web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

4. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

5. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

c. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may

also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

d. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

e. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

6. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

7. If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

8. If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

9. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

10. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

11. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

12. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

13. During the execution of this search warrant, law enforcement is permitted to: (1) depress MCDANIEL's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MCDANIEL's face with his/her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

14. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of

The person of Trevon L. McDaniel; the residence located at 9835 Emerald Park Dr, Elk Grove, CA, 95624; and a white 2009 Jeep with CA license plate 6KGN305

Case No. 2:26-sw-0584 JDP

SEALED

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Eastern District of California *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1 – A-3, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before July 15, 2026 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of __________ .

Date and time issued: July 1, 2026 at 12:27 p.m.

[signature]
*Judge's signature*

City and state: Sacramento, California

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

Signature of Judge

Date

**ATTACHMENT A-1**

PERSON TO BE SEARCHED

The person of Trevon L. McDaniel, whose date of birth is January 24, 2001, and according to his California Driver's License is approximately 5'10" and 230 lbs. The search of MCDANIEL shall include any and all clothing and personal belongings, electronic/digital devices, backpacks, wallets, briefcases, purses, and bags that are within MCDANIEL's control. A photo of MCDANIEL is included below.



**ATTACHMENT A-2**

PREMISE TO BE SEARCHED

The premises to be searched is the residence located at 9835 Emerald Park Dr, Elk Grove, CA, 95624, within the Eastern District of California (the "Target Premises"). The residence consists of an approximate 1,782 square-foot single story, single-family residence. It has light siding with white trim. The residence has a three-car garage that faces west towards Emerald Park Dr. The house numbers '9835' are prominently displayed with black numbering and affixed to the right side of the three-car garage.

The scope of the search shall extend to all areas of the property, including outbuildings and vehicles on the property, over which MCDANIEL has shared or exclusive access or control. A photo of the target premises is included below.



# ATTACHMENT A-3

## VEHICLE TO BE SEARCHED

The vehicle to be searched is a white 2009 Jeep with CA license plate 6KGN305, registered to Trevon Louvell MCDANIEL at 9835 Emerald Park Dr, Elk Grove, CA. A photo of the target vehicle is shown below:



## ATTACHMENT B

### Particular Things to be Seized

1. The items to be seized are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371 – conspiracy; 18 U.S.C. § 844(f)(1) – attempt to damage or destroy property owned or possessed by the United States; 18 U.S.C. § 844(i) – attempt to damage or destroy any building by means of fire or explosives; and 18 U.S.C. § 1366 – attempted destruction of an energy facility, and 26 U.S.C. § 5861(d) – receipt or possession of an unregistered explosive device (collectively, the "TARGET OFFENSES") suspected to have occurred in or around June and July 2026, involving MCDANIEL and others known and unknown:

a. Records, information, documents, programs, applications, photographs, video recordings, audio recordings, communications, items, materials, and other indicia pertaining to acts of violence, including mass casualty threats, firearms and other dangerous weapons, explosives, and destructive devices;

b. Records, information, documents, programs, applications, photographs, video recordings, audio recordings, communications, items, materials, and other indicia pertaining to firearms and other dangerous weapons, explosives, and destructive devices, and components, equipment, and supplies to construct explosives and destructive devices, and destructive devices;

c. Records and information related to murder or shooting politicians, celebrities, wealthy individuals, or other high-profile individuals;

d. Records and information related to acquiring or building weapons, including firearms, ammunition, and explosives, to murder and shoot politicians, celebrities, wealthy individuals, or other high-profile individuals;

e. Records and information related to travel to the area of Washington D.C.;

f. Records and information related to obtaining money or paying for expenses to plan for or commit the TARGET OFFENSES;

g. Records and information related to motivations to commit the TARGET OFFENSES, including perceived objections with the United States government or political officials;

h. Assembled improvised incendiary and/or explosive devices and unassembled components and parts of these devices;

i. Costume clothing, including, but not limited to a black Spider-Man-like mask with red eyes; a dark multi-toned vest with a fluffy light brown hood-trim and x-men

style patch on the right breast; a black long sleeve shirt with a red spider on the chest; and camouflage patterned pants.

j. Drones and drone components, specifically any parts that would allow a drone to hold or release explosive devices;

k. Firearms, firearm accessories and components, and associated ammunition that was to be utilized in the planned attack;

l. Tactical gear, including but not limited to tactical vests, body armor, helmets, and backpacks.

m. Literature and electronic data, media and hardware related to the construction or function of incendiary or explosive devices, including books, pamphlets, drawings, sketches, diagrams, photographs, photocopies, video or audio recordings, and electronic generated or stored data, media and hardware.

n. Records and information relating to a conspiracy to engage in the violations described above;

o. Indicia of residency, including but not limited to utility bills, mortgage statements, subscriber information and mail.

p. Records or keys showing possession of safe deposit boxes, safes, storage units, and any other type of storage areas, including passwords and/or access codes for access during the searches.

q. Records or other items that indicate ownership or use of digital devices or related equipment found in the above premises, including sales receipts, bills, and handwritten notes;

r. Any locked or closed containers believed to contain any of the above-mentioned evidence.

s. Cellular telephones.

2. Computers or storage media used as a means to commit the TARGET OFFENSES, including communicating with co-conspirators or planning to commit the TARGET OFFENSES.

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry

entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user’s state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER’s Internet activity, including firewall logs, caches, browser history and cookies, “bookmarked” or “favorite” web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

4. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

5. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

c. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may

also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

d. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

e. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

6. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

7. If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

8. If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

9. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

10. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

11. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

12. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

13. During the execution of this search warrant, law enforcement is permitted to: (1) depress MCDANIEL's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MCDANIEL's face with his/her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

14. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.